## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **JOHN H. BENGE, JR.**, | ) | |
| | ) | |
| Petitioner | ) | |
| | ) | |
| v. | ) | Civ. Act. No. 08-78-GMS |
| | ) | |
| **MICHAEL DELOY**, Warden, | ) | |
| and **JOSEPH R. BIDEN, III**, | ) | |
| Attorney General of the State | ) | |
| of Delaware, | ) | |
| | ) | |
| Respondents | ) | |

### ANSWER

Pursuant to Rule 5 of the Rules Governing Section 2254 Actions, respondents submit the following in response to the petition for a writ of habeas corpus:

On the morning of October 20, 2002, Rehoboth Beach police received a 911 telephone call reporting a gunshot at the Oak Grove Motor Court Inn. When officers arrived, they discovered John Benge and Edward Stacey Smith fighting on the ground outside the motel. Smith, who was on top of Benge, had been shot in the chest. At the scene, the police recovered two loaded handguns, two speed loaders, loose live .22 caliber rounds, and two holsters on Benge's belt.

The incident was the culmination of the deterioration and later termination of the marriage between Benge and his ex-wife, Donna Kay Lovett.

After her divorce from Benge, Lovett began a new relationship with Stacey Smith, an individual she had known for several years. Smith, an elementary school teacher, worked as a maintenance man in the summer at the motel owned by Donna's family. On October 20, 2002, Benge arrived at the motel, bringing with him two loaded handguns with holsters, extra ammunition in two speed loaders, a pair of wire cutters, and a can of high intensity pepper spray. Benge then entered a motel room, using keys he had duplicated from Lovett's set of keys. After drinking some whiskey, Benge left the motel room to look for Lovett and Smith. Outside, he cut the telephone lines for the motel. Next, Benge entered the motel office which had separate apartments located on each side of the motel's office. Benge went into one of the apartment bedrooms where he found Lovett. Confronting Lovett, Benge demanded to know where Smith was. Apparently unhappy with the answer he received, Benge then sprayed Donna in the face with pepper spray.

As Lovett's face began to burn from the pepper spray, she started screaming for help. Lovett's effort to flee was thwarted when Benge pulled her back and sprayed her again with the pepper spray. In the meantime, Smith had entered the room from the other apartment, leading Benge, who had been holding Lovett and pointing a weapon at her face, to release Lovett. After her release, Lovett fled to the motel office and managed to call police on her cell

2

phone. Lovett observed Benge and Smith struggling, and she heard two gunshots.

On his part, once he had released Lovett, Benge sprayed Smith in the face and chest with pepper spray. In the ensuing struggle, Benge drew one of the pistols. Smith heard gunshots, and he tried to push Benge out of the motel through an outside door. As a result of the struggle with Benge, Smith received a gunshot wound to the chest, a punctured right ear drum, irritated eyes, scratches and scrapes, and a gouge in his left foot. *Benge v. State*, 2004 WL 2742314, order at ¶¶2-8 (Del. Nov. 15, 2004).

The grand jury indicted Benge in January 2003, charging him with various offenses stemming from the October 20 incident. Three counts of the indictment – charging Benge with possession of a deadly weapon by a person prohibited and criminal contempt of a domestic violence protective order – were severed from the other counts in July 2003. Benge was convicted by a Superior Court jury in August 2003 of second degree assault, offensive touching, and first degree criminal trespass. Those convictions were affirmed on appeal. *Benge v. State*, 2004 WL 2742314 (Del. Nov. 15, 2004). The severed counts were set for trial in January 2004, but on the day scheduled for trial, Benge elected to plead guilty to all three counts, and he was sentenced the same day. In December 2006, Benge challenged his January 2004 guilty plea and his sentence, moving for post-conviction relief (under Criminal Rule 61)

3

and to correct his sentence (under Criminal Rule 35). After prosecutors filed a
response to the motions, Superior Court denied Benge's motions in May 2007.
*State v. Benge*, 2007 WL 1520032 (Del. Super. May 2, 2007). On appeal, the
state supreme court affirmed; Benge's motion for reargument was denied
without comment. *Benge v. State*, 945 A.2d 1099 (Del. 2008).

In a petition for federal habeas corpus (DI 1), Benge advances four
arguments:

- the convictions on counts 6 and 12 of the indictment violate
the double jeopardy clause, the counts suffering from a
multiplicity defect, and the state courts were wrong in
holding that counsel's express waiver of the multiplicity
issue during the plea colloquy and sentencing waived the
double jeopardy claim (DI 1 at 6; DI 13 at 33-46);

- his sentences were imposed in violation of the rule set out in
*Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Blakely v.
Washington*, 542 U.S. 296 (2004) (DI 1 at 8; DI 13 at 62-69);

- his guilty plea was not knowing and intelligent (DI 1 at 9; DI
13 at 72-74); and

- the prosecutor's comments at sentencing violated the plea
agreement (DI 1 at 11; DI 13 at 76-81).

Each of these claims was presented to the state supreme court, and Benge has
accordingly exhausted state remedies. *See Smith v. Digmon*, 434 U.S. 332
(1978). But as set out below, none of Benge's claims has any merit, and the
petition should be denied.

**Timeliness**: Under 28 U.S.C. §2244(d)(1), a petition for federal habeas
corpus filed by a state prisoner is subject to a one year statute of limitations.

4

The limitation period begins from the latest of the following dates: the date the state court judgment is final; the date on which an impediment to filing, created by state action violating the federal Constitution or federal law, is removed; the date on which a constitutional right is newly recognized and made retroactively applicable; or the date on which the factual predicate of the claim could have been discovered through the exercise of due diligence. 28 U.S.C. §2244(d)(1)(A)-(D). Only one of these dates is relevant to Benge: the date on which the state court judgment became final.

    a. Benge's conviction became final on February 19, 2004: under Delaware law, the period for taking any appeal to the state supreme court from the January 20, 2004 conviction began on January 21, 2004. *See* Del. Supr. Ct. R. 11(a). Benge then had 30 days in which to file any appeal. *See* Del. Code Ann. tit. 10, §147; Del. Supr. Ct. R. 6(a)(ii). Because Benge did not appeal his conviction, the limitations period under section 2244(d) began to run on February 20, 2004. *Kapral v. United States,* 166 F.3d 565, 577 (3d Cir. 1999); *Eaves v. Burris,* 529 F.Supp.2d 470, 473 (D. Del. 2008); *Barnett v. Carroll,* 514 F.Supp.2d 619, 622 n.2 (D. Del. 2007); *Lindsey v. Carroll,* 421 F.Supp.2d 806, 809 (D. Del. 2006). Benge accordingly had until February 20, 2005 in which to file his federal habeas petition.

    b. Benge posits that his petition is timely under section 2244(d) because his sentence was corrected by Superior Court on November 7, 2005, and his

5

December 2006 state post-conviction action, invoking both Criminal Rules

35(a) and 61, was filed on December 5, 2006, 362 days after the expiration of

the appeal period for the November 7, 2005 corrected sentence order. DI 13 at

25-29. But the rule applied in the Eleventh Circuit, upon whose decisions

Benge relies, is not as broad as Benge would have it. If a prisoner is

resentenced, then under the Eleventh Circuit's rule, the statute of limitations

runs from when the resentencing judgment became final if the habeas petition

includes a claim disputing the resentencing judgment. *Rainey v. Sec'y for the

Dep't of Corrections*, 443 F.3d 1323, 1326-28 (11th Cir. 2006). If the prisoner

"who has been resentenced brings an application challenging only his original

judgment of conviction, the one-year statute of limitations under the AEDPA

runs from the date the original judgment of conviction became final and not the

date the resentencing judgment became final." *Rainey*, 443 F.3d 1326. *Accord

Bachman v. Bagley*, 487 F.3d 979 (6th Cir. 2007). Here, Benge's claims do not

involve the Superior Court's correction of his probationary sentences; instead,

his claims involve only the original judgment. The starting point of the

limitations period, therefore, is February 20, 2004, and Benge in turn had to

file a federal habeas petition on or before February 20, 2005. The petition,

though, was filed on February 4, 2008.[1]

---

[1] The date of filing is the date the prisoner delivers the petition to prison
officials for mailing to the district court, and the date on the petition is the
presumptive date of mailing. *E.g., Woods v. Kearney*, 215 F.Supp.2d 458, 460

There is no basis for the application of statutory tolling under section 2244(d)(2) to Benge's petition. A properly filed state post-conviction motion tolls the limitations period for the time that the action is pending in the state courts, including any post-conviction appeal. *E.g., Swartz v. Meyers*, 204 F.3d 417, 424-25 (3d Cir. 2000). But a state post-conviction action filed after the expiration of the limitations period is irrelevant to the statutory tolling analysis. *See Long v. Wilson*, 393 F.3d 390, 394-95 (3d Cir. 2004). When Benge filed his September 2005 motion for correction of sentence, the limitations period had run, and the September 2005 motion thus had no effect. Similarly, Benge's post-conviction litigation that he initiated in December 2006 has no effect.

c. The limitations period may be tolled for equitable reasons, of course, as this court has noted. *E.g., Eaves*, 529 F.Supp.2d at 476. But one requirement for equitable tolling is that the party invoking the principle have acted diligently in pursuing his rights. *E.g., Pace*, 544 U.S. at 418 (citing *Irwin v. Dep't of Veteran Affairs*, 498 U.S. 89. 96 (1990)). The obligation to act diligently "does not pertain solely to the filing of the federal habeas petition, rather it is an obligation that exists during the period [the prisoner] is exhausting state court remedies as well." *LaCava v. Kyler*, 398 F.3d 271, 277 (3d Cir. 2005) (citing *Jones v. Morton*, 195 F.3d 153, 160 (3d Cir. 1999)). The passage of nearly three years before Benge initiated any challenge to his

---

(D. Del. 2002). The petition is dated February 4, 2008. DI 1 at 16.

January 2004 conviction is hardly evidence of the requisite degree of diligence.

That lapse of time is enough to foreclose any attempt by Benge to invoke

equitable tolling.

**Double Jeopardy:**

Count 6 of the superceding indictment charged Benge with possession of

a firearm by a person prohibited, in violation of Del. Code Ann. tit. 11, §1448.[2]

At the same time, count 12 charged him with criminal contempt of a domestic

violence protective order, in violation of Del. Code Ann. tit. 11, §1271A, the

contemptuous act being his possession of firearms in violation of a protective

order. *See* DI 13 at 13 (quoting indictment). Benge's attorney, Joseph A.

Hurley, Esq., had moved to dismiss the counts on grounds of multiplicity.

(A10).[3]  But when the question was broached by the judge during the plea

colloquy, Hurley specifically said that the defense was waiving the issue,

preferring instead to address the point in the context of sentencing. (A11). At

sentencing later that day, Hurley repeated his comments from the plea

colloquy:  there had been a motion to dismiss counts 6 and 12 on multiplicity

grounds, but Benge "has waived the ability to make those arguments premised

upon what he believes is a fair sentencing recommendation by the State and

---

[2] Benge was prohibited from possessing a deadly weapon by virtue of section 1448(a)(6), prohibiting any person subject to a protection from abuse order (with certain exceptions) from possessing a deadly weapon.

[3] "A" refers to the appendix to the opening brief filed by Benge with the state supreme court in No. 262, 2007.

knowing that the Court is not bound by the recommendation." (A17-18).
Benge was then sentenced on the weapons offense to two years imprisonment,
suspended after six months imprisonment for 18 months probation; on each of
the criminal contempt charges, he was sentenced to a mandatory 15 days
imprisonment.[4]  (A30-31).

In his motion to correct his sentence and in his motion for post-
conviction relief, Benge charged that because counts 6 and 12 were
multiplicitous, being sentenced on both counts violated the Double Jeopardy
Clause.  Superior Court rejected the claim, holding first that to the extent
Benge made the claim in his motion for post-conviction relief, the claim was
foreclosed by Criminal Rule 61(I)(3), Benge having failed to raise the issue on
appeal.  2007 WL 1520032 at *2.  In the alternative, the court ruled that by
virtue of the guilty plea, Benge had waived the issue.  2007 WL 1520032 at *3.
On appeal, the state supreme court similarly concluded that Benge had
procedurally defaulted the double jeopardy claim by not raising it on direct
appeal and alternatively held that the guilty plea, in light of Hurley's
comments, constituted a waiver of the multiplicity defect.  945 A.2d at 1101.

---

[4] The sentence for the weapons conviction was later modified to 2 years
imprisonment, suspended after six months imprisonment for 12 months
probation, the probationary term to run concurrently with the non-
incarcerative portion of the sentence imposed for the August 2003 convictions.
(A37).

Benge writes at length in his brief in support of the petition that the state courts' procedural ruling is not an adequate state law ground to preclude federal habeas review. DI 13 at 46-62. As to this claim, respondents however elect to waive reliance on any procedural default defense. *See Hills v. Washington*, 441 F.3d 1374, 1376-77 (11th Cir. 2006). But the state supreme court's alternative holding that Benge had, by virtue of his guilty plea and by Hurley's express waiver, waived the double jeopardy claim is a decision on the merits. *See Chapman v. LeMaster*, 302 F.3d 1189, 1193, 1194 (10th Cir. 2002) (state court's alternative holding, rejecting claim on merits, is assessed under 28 U.S.C. §2254(d)(1)).

In turn, the decision of the state supreme court is neither contrary to nor unreasonably applies Supreme Court precedent. *See* 28 U.S.C. §2254(d)(1). Benge urges that the state supreme court was wrong in concluding that he had waived his double jeopardy claim: in his view, the decision of the Supreme Court in *Menna v. New York*, 423 U.S. 61 (1975), makes his double jeopardy claim unwaivable. First, the Court in *Menna* itself did not go that far, writing "We do not hold that a double jeopardy claim may never be waived." 423 U.S. at 62 n.2. *See United States v. Broce*, 488 U.S. 563 (1989) (holding that guilty plea waived double jeopardy challenge). And the scenario in *Menna* is not that in which Benge finds himself. The prisoner in *Menna* had refused, after a grant of immunity, to testify before a grand jury. He was held in contempt of court

10

and sentenced to serve a term of 30 days in jail.  More than a year later, Menna was indicted for refusing to answer questions before the same grand jury.  He pleaded guilty and was sentenced; his appeal in the state courts, challenging the plea on double jeopardy grounds, was rejected, the state courts concluding that Menna's guilty plea waived the double jeopardy claim.  The Supreme Court decided otherwise, holding that if the State is constitutionally precluded from bringing a defendant into court on a particular charge, "federal law requires that a conviction on that charge be set aside even if the conviction was entered pursuant to a counseled plea of guilty."  423 U.S. at 62.

Consistent with *Menna*, the courts and commentators have drawn the line exactly there:  those defenses and rights which implicate the very authority of the state to bring the defendant to trial, e.g., former jeopardy, former conviction, former acquittal, unconstitutional statute, are not waived by a guilty plea.  *Haynes v. United States*, 390 U.S. 85, 86 n.2 (1968); *United States v. Herzog*, 644 F.2d 713, 716 (8th Cir. 1981) (defendant who pled guilty could not advance multiplicity claim for first time in post-conviction proceedings; issue was waived by operation of Fed. Crim. Pro. R. 12); *People v. New*, 398 N.W.2d 358, 362, 364 (Mich. 1986); *Sword v. State*, 746 P.2d 423, 425-26 (Wyo. 1987); 5 Wayne R. LaFave, *et al.*, CRIMINAL PROCEDURE 912-13 (3d ed. 2007) (citing and quoting Westen, *Away from Waiver: A Rationale for the Forfeiture of Constitutional Rights in Criminal Procedure*, 75 Mich. L. Rev. 1214,

11

1226, 1236 (1977)). The court in *United States v. Weathers*, 186 F.3d 948 (D.C. Cir. 1999) explained *Menna* in the context of a multiplicity objection to the indictment. Weathers had gone to trial and been convicted of several offenses stemming from his efforts to arrange for the murder of several witnesses and a prosecutor. 186 F.3d at 949-50. Though Weathers had not raised the issue before trial, he contended on appeal that his indictment suffered from a multiplicity defect. 186 F.3d at 951-52. The D.C. Circuit decided that because Weathers had not advanced the multiplicity claim until the appeal, consideration of it was foreclosed by Federal Rule of Criminal Procedure 12(f), the issue being one that under Rule 12(b)(2) had to be raised before trial.[5] 186 F.3d at 952-55. *Menna* and its rule against finding a double jeopardy claim to be waived were distinguishable. The defect in *Menna*, that the defendant had been previously convicted, went to the heart of the government's ability to bring the defendant into court again, i.e., the government could not constitutionally prosecute the defendant. In contrast, "a claim of multiplicity... does not bar prosecution or prevent the government from haling a defendant into court...." 186 F.3d at 957. *See* 186 F.3d at 958 n.14 (distinguishing multiplicity defects from other double jeopardy claims). Along similar lines, a multiplicity defect

---

[5] The terms of Federal Criminal Rule 12(b)(2) in effect at the time of the decision in *Weathers* are now at Rule 12(b)(3); Federal Criminal Rule 12(f) is now at current Federal Criminal Rule 12(e). The terms of current Superior Court Criminal Rules 12(b)(2) and 12(f) are substantially identical to the federal analogs.

was curable: the government need only to obtain a superceding indictment that deletes one of the counts creating the defect. But the double jeopardy problem in *Menna* could never be cured by reindictment – the defendant there was simply protected against the second prosecution. 186 F.3d at 954-55, 957.

Moreover, Benge pled guilty under a plea agreement in which the prosecution agreed to recommend a specific sentence. Benge had expressly made a multiplicity challenge to counts 6 and 12 of the indictment: his attorney stood before the judge at both the plea colloquy and sentencing and made the point. (A10, 17). And just as clearly, defense counsel at both the plea colloquy and at sentencing expressly withdrew the issue, specifically waiving the issue in light of the State's sentencing recommendation embodied in the plea agreement. (A11, 18). Given Benge's express waiver of the multiplicity argument and the nature of the plea agreement, Benge waived any double jeopardy claim he had. *United States v. Pratt,* 657 F.2d 218, 220-21 (8th Cir. 1981) (plea agreement to counts of distribution of PCP waived multiplicity claim where government agreed to dismiss four other counts of indictment); *Herzog,* 644 F.2d at 716; *Novaton v. State,* 634 So.2d 607 (Fla. 1994) (plea agreement in which government agreed to forego habitual offender sentence waived double jeopardy claim as to convictions and sentence for two counts of possession of firearm during underlying felonies); *Games v. State,* 743

N.E.2d 1132, 1134-35 (Ind. 2001) (plea agreement to be sentenced for murder, robbery, and conspiracy, in exchange for prosecutor withdrawing request for death penalty, constituted waiver of defendant's claim that sentence for both murder and robbery violated double jeopardy clause); 5 CRIMINAL PROCEDURE at 917 ("Even if the constitutional violation has produced an incurable defect so that the right is not automatically forfeited by a plea of guilty, there might still occur an enforceable waiver of that same right in a particular case."). Decisions of the federal and other state courts are relevant in assessing whether the state court's application of Supreme Court precedent in the particular case was reasonable. *Price v. Vincent*, 538 U.S. 634, 643 & n.2 (2003); *Chadwick v. Janecka*, 312 F.3d 597, 613 (3d Cir. 2002) (quoting *Matteo v. Sup't, SCI Albion*, 171 F.3d 877, 890 (3d Cir. 1999) (en banc)). In light of the decisions of other courts on the point, "it was at least reasonable for the state court to conclude" that Benge had waived his multiplicity claim. Under section 2254(d)(1) then, Benge has not made out a claim for relief.

**Sentencing:**

Benge, as already noted, was convicted of possession of a deadly weapon by a person prohibited and two counts of criminal contempt of a domestic violence protective order. On the weapons offense, Benge was sentenced to 2 years imprisonment, suspended after 6 months imprisonment served under Del. Code Ann. tit. 11, §4204(k) for probation. For each of the criminal

14

contempt charges, Benge was sentenced to a 15 day term of imprisonment. Benge challenged his sentence as being invalid under *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and subsequent cases: the imposition of the section 4204(k) condition was not based on facts admitted by him or found by a jury; and the 15 day mandatory sentences imposed on the contempt convictions were similarly defective, not being based on facts admitted by him or found by a jury. Superior Court rejected the claims, holding that the claim was defaulted under Criminal Rule 61(i)(3) because Benge had not raised the issue on direct appeal. 2007 WL 1520032 at *2. Alternatively, Superior Court denied the claim on the merits, *Apprendi* not being applicable to the Delaware sentencing scheme. 2007 WL 1520032 at *3. The state supreme court held that the *Apprendi* claim was untimely under Criminal Rule 35(a) and that, in any event, the claim was without merit. 945 A.2d at 1102.

Benge writes at length in his brief in support of the petition that the state courts' procedural ruling is not an adequate state law ground to preclude federal habeas review. DI 13 at 46-62. The Court need not resolve that issue. Instead, Benge's attack on his sentences is barred by the retroactivity doctrine of *Teague v. Lane*, 489 U.S. 288 (1989), and judicial economy militates in favor of deciding the claim on the basis of *Teague*. *See Lambrix v. Singletary*, 520 U.S. 518, 525 (1997); *id.* at 547 (O'Connor, J., dissenting) ("Of course, there may be exceptions to the rule that the procedural bar issue should be resolved

15

first. One case might be where the procedural bar question is excessively complicated, but the *Teague* issue can be easily resolved.").

Under *Teague*, new constitutional rules of criminal procedure are inapplicable to cases which have become final before the new rule is announced. *See, e.g., Horn v. Banks*, 536 U.S. 266, 271 (2002). A case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final. *See, e.g., Lewis v. Johnson*, 359 F.3d 646, 653 (3d Cir. 2004). "If, however, the decision did not announce a new rule, it is necessary to inquire whether granting the relief sought would create a new rule because the prior decision is applied in a novel setting, thereby extending the precedent." *Stringer v. Black*, 503 U.S. 222, 228 (1992). Here too, if a new rule would be created, *Teague* requires the court to deny relief.

The *Teague* analysis requires the court to proceed in three steps. "First, the court must determine when the defendant's conviction became final. Second, it must ascertain the 'legal landscape as it then existed,' and ask whether the Constitution, as interpreted by the precedent then existing, compels the rule. That is, the court must decide whether the rule is actually 'new.'" *Beard v. Banks*, 542 U.S. 406, 411 (2004) (quoting *Graham v. Collins*, 506 U.S. 461, 468 (1993) and citing *Saffle v. Parks*, 494 U.S. 484, 488 (1990)). The last step, reached only if the court decides the defendant is asking for a

16

new rule, is to decide if the rule fits within either exception to *Teague. Beard,*
542 U.S. at 411. The first step in the analysis here is straightforward: Benge's
conviction became final in February 2004 when the period expired in which he
could have appealed to the Delaware Supreme Court. *See Roberts v. Cockrell,*
319 F.3d 690, 694 (5th Cir. 2003) ("If the defendant stops the appeal process
before that point [i.e., the expiration of the period in which he can seek review
by the United States Supreme Court], the conviction becomes final when the
time for seeking further direct review in the state court expires."); *Jackson v.
Johnson,* 217 F.3d 360, 364 (5th Cir. 2000). *Cf. Kapral v. United States,* 166
F.3d 565, 577 (3d Cir. 1999) ("If a defendant does not pursue a timely direct
appeal to the court of appeals, his or her conviction and sentence become final,
and the statute of limitation begins to run, on the date on which the time for
filing such an appeal expired."). *See generally Caspari v. Bohlen,* 510 U.S. 383,
390 (1994) ("A state conviction and sentence become final for purposes of
retroactivity analysis when the availability of direct appeal to the state courts
has been exhausted and the time for filing a petition for a writ of certiorari has
elapsed or a timely filed petition has been finally denied."). That Benge in the
fall of 2005 filed a motion to correct the probationary term that had been
imposed as part of his sentence does not vitiate the finality of his conviction in
February 2004. *See Beard,* 542 U.S. at 411-13; *Richardson v. Gramley,* 998
F.2d 463 (7th Cir. 1993).

17

The other two steps of the analysis have already been resolved. *Blakely* was decided by the Supreme Court on June 24, 2004, four months after Benge's convictions became final. The Third Circuit in turn has held that *Blakely* claims are foreclosed by the retroactivity doctrine of *Teague*. *See Lloyd v. United States*, 407 F.3d 608, 612-16 (3d Cir. 2005) (*United States v. Booker*, 543 U.S. 220 (2005), applying *Blakely* to federal sentencing guidelines, not retroactively applicable to defendant filing first post-conviction motion); *In re Olopede*, 403 F.3d 159 (3d Cir. 2005) (denying leave to file, under 28 U.S.C. §2244(b), second federal post-conviction motion advancing *Booker* claim). Accordingly, Benge's claim that his sentence was imposed in violation of *Blakely* can be rejected on the basis of *Teague*.

**Entry of Guilty Plea:**

Benge was charged with possession of a deadly weapon by a person prohibited, specifically a handgun while subject to a protection from abuse order issued by the Family Court. That particular count of the indictment was captioned "Possession of a Firearm by a Person Prohibited" and referred to Del. Code Ann. tit. 11, §1448(a)(6). *See* DI 13 at 13. The section heading of section 1448 itself names the offense as being possession of a deadly weapon by a person prohibited, but the statute covers purchase, ownership, or control of a deadly weapon as well as possession. Del. Code Ann. tit. 11, §1448(a), (b). The statute also reaches ammunition for a firearm as well as any deadly weapon.

Del. Code Ann. tit. 11, §1448(a), (b).  Section 1448(a)(6) is one of the several
means by which a person can be disqualified from possessing a deadly weapon.
*See* Del. Code Ann. tit. 11, §1448(b) (referring to "any prohibited person as set
forth in subsection (a)").  The elements of the offense are (a) the defendant's
status as a person prohibited; (b) knowing possession on the part of the
defendant; and (c) the item possessed is a deadly weapon (or is ammunition for
a firearm).  *See Kipp v. State*, 704 A.2d 839, 842 (Del. 1998).  Section 1448(c) is
the general penalty provision:  the crime is generally punishable as a class F
felony (i.e., punishable by 0 to 3 years imprisonment).[6]  If the deadly weapon is
instead a firearm or ammunition for a firearm, then the crime is generally
punishable as a class D felony (i.e., punishable by 0 to 8 years imprisonment).[7]

   *Nature of the offense*:  In the plea colloquy, the judge asked Benge if he
"wish[ed] to plead guilty to Count 6, possession of a – I guess the correct name
is possession of a deadly weapon by a person prohibited, because it is under
1448(a)(6), having a firearm in your possession while being under a Family
Court Protection from Abuse Order...."  (A9).  Benge replied in the affirmative.
(A10).  In response to the judge's inquiry if he "commit[ted] that offense," Benge
said "yes."  (A10).  Benge complained in his post-conviction motion that the
judge did not explain the elements of the weapons offense to him and, based on

---

[6] Del. Code Ann. tit. 11, §4205(b)(6) (Repl. 2001).
[7] Del. Code Ann. tit. 11, §4205(b)(4) (Repl. 2001).

some confusion on the part of the court clerk at sentencing because the
caption of Count 6 did not exactly correspond to the heading of section 1448,
that he did not understand the nature of the charge to which he pled. Superior
Court held the claim to be defaulted under Criminal Rule 61(i)(3) because the
issue was not raised on direct appeal. 2007 WL 1520032 at *2. In the
alternative, the court ruled that Benge was not entitled to relief on the merits.
2007 WL 1520032 at *3. On appeal, the state supreme court, invoking
Criminal Rule 61(i)(3), held that the claim had been defaulted by Benge's
failure to raise the issue on appeal. 945 A.2d at 1101.

*Explanation of maximum penalty*: On the guilty plea form, the penalty
range for the weapons offense was set out as "0-2." (A7). In the plea colloquy,
the judge advised Benge that the maximum sentence for the weapons offense
was two years imprisonment. (A11-12). But the offense was in fact punishable
by up to 8 years imprisonment, the weapons offense being a class D felony in
light of Benge's possession of a firearm. Benge complains that the information
on the guilty plea form about the sentencing range and the judge's statements
in the plea colloquy misrepresented the maximum potential sentence for the
weapons offense. Here too, Superior Court held the claim to be procedurally
defaulted under Criminal Rule 61(i)(3) because Benge did not pursue the issue
on direct appeal. 2007 WL 1520032 at *2. In the alternative, the court ruled
that Benge was not entitled to relief on the merits. 2007 WL 1520032 at *3.

On appeal, the state supreme court, invoking Criminal Rule 61(i)(3), held that the claim had been defaulted by Benge's failure to raise the issue on appeal. 945 A.2d at 1101.

**Procedural Default**: This Court has consistently held that Rule 61 is an independent and adequate state procedural rule precluding federal habeas review. *E.g., Mills v. Carroll*, 515 F.Supp.2d 463, 468 (D. Del. 2007); *McCleaf v. Carroll*, 416 F.Supp.2d 283, 296 (D. Del. 2006); *Carter v. Neal*, 910 F.Supp. 143, 149-50 (D. Del.1995). By rejecting Benge's challenge to the entry of the guilty plea under Rule 61(i)(3), the Delaware Supreme Court plainly stated that its decision rested on state law grounds. Thus, the Court is barred from reviewing the merits of the claim absent a showing of cause for the default, and prejudice resulting therefrom, or upon a showing that a miscarriage of justice will occur if the claims are not reviewed. *E.g., Bousley v. United States*, 523 U.S. 614, 622-23 (1998).

Benge, as he did in the state courts, attempts to show cause for the default. *See* DI 13 at 70-72. But Benge's efforts to lay the blame at the feet of the prosecutor miss the mark:  the prosecutor had nothing to do with Benge's decision not to pursue a direct appeal.  Because Benge's allegation of cause does not explain the default, the Court can disregard Benge's explanation. *Mills v. Carroll*, 515 F.Supp.2d 463, 468 (D. Del. 2007); *Bailey v. Kearney*, 1997 WL 309449, mem. op. at *3-4 (D. Del. Apr. 3, 1997).  In turn, because

21

Benge has not shown cause for the default, the Court need not reach the question of any actual prejudice stemming from the underlying error. *E.g.,* *Lawrie v. Snyder*, 9 F.Supp.2d 428, 452 (D. Del. 1998) (citing cases).

Benge urges that he has, however, established his "factual innocence" of the weapons offense and the criminal contempt charges because the underlying Family Court order, i.e., the protection from abuse order, was issued by a Family Court Commissioner, not a Family Court judge. DI 13 at 82-84. In the first instance, though Benge contends that he has established his "actual innocence," his "claim, at bottom, is simply a legal not a factual one, and the Supreme Court has 'emphasized that the miscarriage of justice exception is concerned with actual as compared to legal innocence.' A legal claim that a substantive criminal statute has been wrongly applied to facts can, by resort to a rather unsophisticated play on words, always be converted into a complaint that the relevant facts did not support a conviction and that therefore the defendant was 'actually innocent.'" *Embrey v. Hershberger*, 131 F.3d 739, 741 (8th Cir. 1997) (en banc) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 339 (1992)).

Moreover, as a matter of state law, Benge's argument starts from the wrong premise. A protection from abuse proceeding, under Del. Code Ann. tit. 10, §§1041-48, is an independent action; there is no statutory requirement that the proceeding be ancillary to a divorce proceeding. Thus, Benge's

22

argument that the Family Court Commissioner had no jurisdiction to issue the
protection order because the divorce case had not been referred to the
Commissioner (Del. Code Ann. tit. 10, §915(c)(2)) is besides the point. In
addition, Commissioners may be assigned additional duties by the Chief Judge
(Del. Code Ann. tit. 10, §915(f)), and the Family Court has written that
Commissioners have the authority to issue protection orders under sections
1043 and 1044. *J A. P v. J W. D*, 2005 WL 3560819 (Del. Fam. Ct. Apr. 25,
2005); *Thomas v. Thomas,*1996 WL 797034, at *4 (Del. Fam. Ct. Oct. 7, 1996).
Benge has not established his "actual innocence," and his challenge to the
entry of the guilty plea is procedurally barred.

**Alleged violation of plea agreement:**

The plea agreement reached on the day of trial required the prosecutor to
recommend for the weapons offense 2 years imprisonment, suspended for 1
year Level III probation. For each count of criminal contempt of a protective
order, the prosecutor agreed to recommend 1 year imprisonment, suspended
after 15 days for Level III probation. In addition, the probationary terms could
run concurrently. (A6, 8-9). At sentencing, the judge commented that the
State was still presumably bound by the sentencing recommendation contained
in the plea agreement. (A21). The prosecutor responded that "it [was] a fair
conclusion" to the case, noting that Benge faced additional prison time in
separate proceedings in New Castle County. (A21). She observed that there

23

was no expectation that the three charges would lead to "any additional jail time" being imposed on Benge, but "as a matter of principle," it was important that Benge's record show that he had disobeyed an order of a state court. (A21-22).

Benge charged that the prosecutor's remarks violated the plea agreement. The Superior Court judge held the claim barred by Criminal Rule 61(i)(3) because Benge had not raised it on direct appeal. In any event, according to the judge, the prosecutor's remarks were entirely consistent with the plea agreement: "Her final sentencing comments were directed to why the thirty (30) days was [sic] appropriate and nothing more." On appeal, the state supreme court, invoking Criminal Rule 61(i)(3), held that the claim had been defaulted by Benge's failure to raise the issue on appeal. 945 A.2d at 1101.

**Procedural Default**: This Court has consistently held that Rule 61 is an independent and adequate state procedural rule precluding federal habeas review. *E.g., Mills v. Carroll*, 515 F.Supp.2d 463, 468 (D. Del. 2007); *McCleaf v. Carroll*, 416 F.Supp.2d 283, 296 (D. Del. 2006); *Carter v. Neal*, 910 F.Supp. 143, 149-50 (D. Del.1995). By rejecting Benge's challenge to the prosecutor's remarks at sentencing, the Delaware Supreme Court plainly stated that its decision rested on state law grounds. Benge, however, asserts that the state courts do not consistently apply Criminal Rule 61(i) to such claims, and the procedural rule is not adequate to preclude federal habeas review. DI 13 at 75.

24

Though Benge correctly points out that no procedural bar was applied by the state court in the case of John Schmitz, the state courts did apply the terms of Rule 61(i) in *Webb v. State*, 2001 WL 1586877 (Del. Dec. 7, 2001) and *Hill v. State*, 2000 WL 1177628 (Del. Aug. 11, 2000), indicating a more consistent application than Benge implies. Thus, the Court is barred from reviewing the merits of the claim absent a showing of cause for the default, and prejudice resulting therefrom, or upon a showing that a miscarriage of justice will occur if the claims are not reviewed. *E.g., Bousley v. United States*, 523 U.S. 614, 622-23 (1998).

Benge attempts to show cause for the default. *See* DI 13 at 75. But Benge's efforts do not explain why the issue was not advanced on direct appeal (or even why there was no appeal). Because Benge's allegation of cause does not explain the default, the Court can disregard Benge's explanation. *Mills v. Carroll*, 515 F.Supp.2d 463, 468 (D. Del. 2007); *Bailey v. Kearney*, 1997 WL 309449, mem. op. at *3-4 (D. Del. Apr. 3, 1997). In turn, because Benge has not shown cause for the default, the Court need not reach the question of any actual prejudice stemming from the underlying error. *E.g., Lawrie v. Snyder*, 9 F.Supp.2d 428, 452 (D. Del. 1998) (citing cases).

Benge urges that because he has established his "actual innocence" of the offenses, the default in the state courts should be excused and this Court should consider the claim. DI 13 at 76, 82-84. As set out in the response to

Benge's complaint about the entry of the guilty plea, Benge has made out no claim of actual innocence.

**State Court Records**:  Based upon the Superior Court docket sheet, the plea colloquy and sentencing were recorded, and the transcript has been prepared.  Because Benge made no allegations of ineffective assistance of counsel, there is no affidavit from defense counsel under Criminal Rule 61(g)(2).

The petition for a writ of habeas corpus should accordingly be dismissed without further proceedings.

Elizabeth R. McFarlan
Deputy Attorney General
Del. Bar ID 3759
elizabeth.mcfarlan@state.de.us

Loren C. Meyers
Deputy Attorney General
Del. Bar ID 2210
loren.meyers@state.de.us

Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 577-8500

August 4, 2008

26

Westlaw.

Not Reported in F.Supp.                                                                Page 1
Not Reported in F.Supp., 1997 WL 309449 (D.Del.)
**1997 WL 309449 (D.Del.)**

Bailey v. Kearney
D.Del.,1997.
Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Weston D. BAILEY, Petitioner,

v.

Rick KEARNEY, Warden, Sussex Correctional Institution and M. Jane Brady, Attorney General of the State of
Delaware, Respondents.
**No. Civ. A. 95-279-SLR.**


April 3, 1997.


Weston D. Bailey, petitioner, *pro se.*
Loren C. Meyers, Esquire, Chief of Appeals Division, Department of Justice, Wilmington, Delaware, Attorney for
Respondents.


MEMORANDUM OPINION


SUE L. ROBINSON, District Judge.


I. INTRODUCTION


**\*1** Petitioner Weston Bailey D. Bailey ("Bailey") seeks habeas corpus relief pursuant to 28 U.S.C. § 2254. Pursuant
to the court's August 22, 1996 order (D.I.17), both Bailey and respondents have filed briefs in support of their
respective positions. (D.I.20, 23) This matter is ripe for judicial action.


II. FACTUAL AND PROCEDURAL BACKGROUND


In April 1994 Bailey pleaded guilty before the Superior Court of the State of Delaware to charges of robbery in
the first degree, possession of a deadly weapon during the commission of a felony and assault in the first degree.
On May 27, 1994, he was sentenced to a term of sixteen years. (D.I. at 2) Bailey filed a motion for post-conviction
relief pursuant to Superior Court Rule 61 on July 8, 1994, and supplemented this motion on September 30, 1994.
The Superior Court denied the motion on October 18, 1994. (D.I. 4 at B-1, B-5) On December 22, 1994, petitioner
appealed the Superior Court's denial of his Rule 61 motion to the Delaware Supreme Court. (D.I. 12, Appellant's
Opening Brief) State prosecutors moved for summary affirmance of the Superior Court decision under Delaware
Supreme Court Rule 25(a). (D.I. 12, Appellee's Motion to Affirm) On January 30, 1995, the Delaware Supreme
Court granted this motion. (D.I.12, Order) This petition followed.

In his petition, Bailey sets forth three claims. Claim 1 asserts that Bailey's conviction is unlawful because during
the judge's plea colloquy, the judge "never explained to Bailey the action or conduct on his part necessary to be

http://web2.westlaw.com/print/printstream.aspx?utid=%7b...

guilty of the charges he [p]lead guilty to." (D.I. 2 at 5) Claim 2 asserts that Bailey's conviction is unlawful because the judge "never asked Bailey had he been promised anything, threaten[ed] by anyone or forced to enter his plea of guilty because of [the] wishes of his lawyer or someone else or by some type of misconception." (D.I. 2 at 5) Claim 3 asserts that the judge's plea colloquy was further deficient because the judge failed to canvass the issues of the case and relied upon the statements of Bailey's lawyer in determining that the plea was voluntary. (D.I. 2 at 6)

On August 21, 1996, Bailey filed a motion to dismiss. (D.I.16) On August 22, 1996, the court denied Bailey's motion and noted that claims 1 and 2 may be barred by procedural default since he failed to present them to the state courts. (D.I.17) The court ordered Bailey to file a brief setting forth his arguments relative to the issue of procedural default bar, including a demonstration of either cause and prejudice or that a miscarriage of justice would result from the court's failure to consider his claims. (D.I.17) The court also ordered respondents to file a brief in support of the position that the plea colloquy was sufficient under *Boykin v. Alabama,* 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). (D.I.17)

## III. DISCUSSION

### A. The Antiterrorism and Effective Death Penalty Act

Since this petition was filed, Congress passed the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. 104-132, 110 Stat. 1214. This statute amends several of the provisions pertaining to federal habeas corpus relief. The amendments place time limits on petitions for relief from state court convictions, permit federal courts to deny relief on the merits despite failure to exhaust state remedies, and foreclose relief on grounds previously adjudicated in state court, unless such previous adjudication

**\*2** (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996). With regard to factual issues, the new provisions state that any factual determination made by a state court shall be presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e).

The Third Circuit has not ruled on whether the non-death penalty provisions of the AEDPA apply retroactively. *See, e.g., Berryman v. Morton,* 100 F.3d 1089, 1102-03 (3d Cir.1996); *Myers v. Gillis,* 93 F.3d 1147, 1149 n. 1 (3d Cir.1996). Other courts of appeal are split. The Second, Ninth, and Tenth Circuits have held that these provisions should not be applied to cases pending when the AEDPA was passed. *Boria v. Keane,* 90 F.3d 36, 38 (2d Cir.1996); *Edens v. Hannigan,* 87 F.3d 1109, 1112 n. 1 (10th Cir.1996); *Jeffries v. Wood,* 103 F.3d 827 (9th Cir.1996) (en banc). Three other circuit courts, however, have applied the amendments retroactively. *Lindh v. Murphy,* 96 F.3d 856 (7th Cir.1996), *cert. granted,* 519 U.S. 1074, 117 S.Ct. 726, 136 L.Ed.2d 643 (1997); *Hunter v. United States,* 101 F.3d 1565 (11th Cir.1996) (en banc); *Drinkard v. Johnson,* 97 F.3d 751 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997). Because, in the case at bar, the outcome would be the same under either standard, the court finds that it is unnecessary, at this time, to take a position on this unsettled issue of law. For the purposes of this decision, the court's analysis will follow the old rules.

## B. Exhaustion Requirement

Before the court reviews petitioner's claims, it will ascertain whether petitioner has exhausted all available state remedies. 28 U.S.C. § 2254(b).FN1 Comity is the rationale underlying the exhaustion requirement, which allows state courts the first opportunity to pass on alleged defects in the criminal proceedings leading to the conviction at issue. Recognizing that principles of federal-state comity must restrain unnecessary "[f]ederal intrusions into state criminal trials,"*Engle v. Isaac,* 456 U.S. 107, 128, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), the United States Supreme Court has held that the exhaustion requirement must be "rigorously enforced." *Rose v. Lundy,* 455 U.S. 509, 518, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *see also Santana v. Fenton,* 685 F.2d 71, 77 (3d Cir.1982).

> FN1. Except where otherwise noted, references to § 2254 are to the statute as it existed before passage of the AEDPA.

To exhaust state remedies, a petitioner must have raised before the highest state court the factual and legal premises of the claims for relief he asserts in the federal proceeding. *Chaussard v. Fulcomer,* 816 F.2d 925 (3d Cir.1987); *Gibson v. Scheidemantel,* 805 F.2d 135, 138 (3d Cir.1986). In a case where the court determines that the petitioner has not exhausted all state remedies, the court may also determine whether "recourse to state collateral review whose results have effectively been predetermined ..." would justify review by the district court. *Castille v. Peoples,* 489 U.S. 346, 350, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989).

*3 In his habeas petition, Bailey raises three specific complaints. Claim 3 was presented to the state supreme court, thus exhausting state remedies. (D.I. 12, Appellant's Opening Brief at 1) Claims 1 and 2 were not presented to the state courts and are, therefore, barred by Delaware Criminal Rule 61(i)(2). (D.I. 17 at 2) For the reasons stated in the court's August 22, 1995 order, Bailey is excused from the exhaustion requirement as to these claims. (D.I. 17 at 2)

## C. Procedural Default for Claims 1 and 2

Bailey's first two claims charge that the trial judge did not explain to him during the plea colloquy the nature of the offenses to which he was pleading guilty, and that the judge accepted the plea without establishing that petitioner knew the consequences of the plea and that the plea was not coerced. (D.I. 2 at ¶¶ 112a and 12B) Because Bailey failed to raise these claims in his post-conviction relief motion and has consequently defaulted them in state court pursuant to an independent and adequate state procedural rule-Criminal Rule 61(i)(2)-federal habeas review of the claims is barred unless petitioner can "demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in the fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). The Supreme Court has held that " 'cause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him...." *Id.,* 501 U.S. at 753,*citing Murray v. Carrier,* 477 U.S. 478, 488 (1986) (emphasis in original). To demonstrate cause for a procedural default, petitioner must show that "some objective factor external to the defense" precluded his compliance with the state procedural rules. *McCleskey v. Zant,* 499 U.S. 467, 493, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), *quoting Murray v. Carrier,* 477 U.S. 478, 488 (1986).

Bailey argues that cause for his procedural default and actual prejudice exists due to the ineffectiveness of his defense attorney. (D.I. 20 at 4) Bailey specifically alleges that his trial counsel "intentionally deceived [him] prior to his entering a plea of guilty" for the three counts. (D.I. 20 at 4) He alleges that he "entered the plea of guilty

on the promise of counsel; [sic] he would only receive a four (4) year sentence under supervision level 5 for the offenses committed." (D.I. 20 at 4-5) Bailey also points out that his trial counsel did not object to the prosecutor's recommendation that he be sentenced for fifteen years at supervision level 5. (D.I. 20 at 5)

The court is unpersuaded by Bailey's arguments. The procedural default issue relates to Bailey's failure to raise claims 1 and 2 in his state post-conviction motion. (D.I. 23 at 3) The performance of Bailey's defense counsel during the plea proceedings and at sentencing is not relevant to this issue. The alleged defectiveness of Bailey's attorney does not explain why Bailey failed to raise claims 1 and 2 in his state post-conviction motion.FN2

> FN2. Bailey was not represented by counsel in the state post-conviction proceedings.

*4 As Bailey notes, ineffective assistance of counsel may constitute cause for a procedural default. *Murray v. Carrier,* 477 U.S. 478, 488-489 (1986). However, this claim must itself be presented to the state courts as required by the exhaustion doctrine. *Id.* at 488-499. Bailey failed to raise this claim in his state post-conviction motion and does not offer any explanation for this failure. Accordingly, this claim is procedurally barred from federal habeas review.FN3 Since Bailey has offered no explanation why he failed to raise claims 1 and 2 in his state post-conviction motion, the court finds that he has failed to establish cause. Since Bailey has failed to establish cause, the court need not reach the question of whether he has shown any actual prejudice from the alleged violation of federal law. *Presnell v. Kemp,* 835 F.2d 1567, 1582 n. 29 (11th Cir.1988) (citations omitted).

> FN3. The court, therefore, will not consider this claim as an independent ground for relief.

The court also finds that Bailey fails to establish that a "miscarriage of justice" would occur if these claims were not reviewed by this court. "[T]he miscarriage of justice exception is concerned with actual innocence as compared to legal innocence. ...." *Sawyer v. Whitley,* 505 U.S. 333, 339, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). "Actual innocence" requires "the petitioner to show that it is more likely than not that no reasonable juror would have convicted him." *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 867, 130 L.Ed.2d 808 (1995); *Sawyer,* 505 U.S. at 340 ("A prototypical example of 'actual innocence' in a colloquial sense is the case where the State has convicted the wrong person of the crime."). The petitioner must "show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial, the trier of the facts would have entertained a reasonable doubt about his guilt." *Kuhlmann v. Wilson,* 477 U.S. 436, 455 n. 17, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) (internal quotations omitted). *See also Sawyer,* 505 U.S. at 350 (petitioner must show by clear and convincing evidence that but for constitutional error ..., no reasonable juror would have found him eligible for" the crime charged).

In the present case, Bailey's claims relating an involuntary guilty plea do not amount to claims of "actual innocence." Bailey's claims concern legal deficiencies during the plea colloquy which do not constitute an argument of "actual innocence." *See Stanley v. Lockhart,* 941 F.2d 707, 709 (8th Cir.1991) (not addressing petitioner's allegations that his plea was defective in considering his actual innocence). Bailey expressly acknowledged his guilt during the plea colloquy.FN4 (D.I. 4 at A8-9) In his memorandum in support of his habeas petition, Bailey does not argue that he is actually innocent. In his brief to the Supreme Court of the State of Delaware, Bailey does assert that he "seeks to withdraw his plea and take his case to [t]rial and let his peers be his [j]udge, because he went along for a ride and is not able to control the actions of others when they seek to commit criminal acts." (D.I. 4, Appellant's opening brief at 5) He also argued that "his lawyer mis-informed [sic] him about [the] criminal liabilities which influenced him to take this ill-fated plea to a crime he didn't commit." (D.I. 4, Appellant's opening brief at 8) Aside from these general arguments, Bailey does not appear to argue that he is "actually innocent" of the crimes for which he was convicted.

FN4. During the plea colloquy, the judge specifically asked Bailey whether he was actually guilty and Bailey affirmatively answered:

> THE COURT: Are you entering these pleas of guilty to the charge of robbery in the first degree, possession of a deadly weapon during the commission of a felony, and assault first degree, because, in fact, you are guilty of these charges?

> THE DEFENDANT [Bailey]: Yes. (D.I. 4 at A-8-9)

*5 Indeed, in stating that "he went along for a ride" and was "not able to control the actions of others when they seek to commit criminal acts," Bailey appears to admit that he was in the vehicle used the night of the robbery. Furthermore, in his motion for post-conviction relief before the Superior Court of the State of Delaware, Bailey stated "that [he] would have never taken such a plea ... because of his limited role in the incident which did not include the actual robbery or weapon offense(s)." (D.I. 26, Respondent's motion to affirm at B-29) This plainly contradicts his statement to police that he stayed with his girlfriend the night of the robbery. (D.I. 26, Bailey's Statement to Police at 2)

The investigation report also does not provide any facts in Bailey's favor. In the report, Bailey's girlfriend stated that Bailey was involved in the robbery and not with her that night. (D.I. 26, Crime report at 7) Bailey's three co-conspirators also stated to police that Bailey was involved in the armed robbery.[FN5] (D.I. 26, Statement of Shavelle Washington at 1; Statement of Curtis Townsend at 3; Statement Bobby Collins at 2) The clerk of the tavern that was robbed also identified Bailey in a photographic line-up as the person holding the gun during the robbery. (D.I. 26, Crime report at 9)

> FN5. Collins and Washington were convicted for the armed robbery after a jury trial in Superior Court in March 1994. (See D.I. 12, Respondents' motion to affirm at B-12) Townsend pled guilty to robbery and conspiracy in April 1994. The convictions of Collins and Washington were affirmed on direct appeal. *Collins v. State*, No. 232,1994; 1995 WL 120655 (Del.Supr., March 10, 1995); *Washington v. State*, No. 195,1994; 1994 WL 716044 (Del.Supr., Dec.20, 1994).

Based on these facts and the fact that Bailey does not appear to argue that he is "actually innocent," the court finds that he has failed to establish that a fundamental miscarriage of justice would occur if his claims are not reviewed. Accordingly, the court finds that claims 1 and 2 are barred from federal habeas review as they are procedurally defaulted claims.

## D. Claim 3

Bailey's third claim is that the plea colloquy was defective because the trial judge "fail[ed] to canvass[ ] ... the issues of [the] case before him to determine [the] voluntariness of [the] plea...." (D.I. 2 at 6, ¶ 12c) More specifically, Bailey contends that the judge failed "to meet his responsibilities" by allowing defense counsel to ask most of the questions during the colloquy.[FN6] (D.I. 2 at 6, ¶ 12c) Bailey complains that the trial judge, (1) "didn't ask him anything about was he promised anything, was his plea coerced, that he had a right to go to trial, if he still wished to and that the decision to plead guilty must be his own and not the wishes of anybody else or of his lawyer;" (2) "never made the determination" whether the plea was entered knowingly and voluntarily; and (3) "failed completely" to address the issues of "coercion, understanding of the accusation and knowledge of the direct consequences of the plea." (D.I. 4, Appellant's Opening Brief at 5-6)

FN6. The plea colloquy transcript reveals that Bailey's trial counsel, Mr. Callaway, questioned him as follows:

[MR. CALLAWAY:] Mr. Bailey, I show you this Plea Agreement and ask you if this is your signature.

THE DEFENDANT: Yes.

MR. CALLAWAY: Did you and I go over each and every paragraph of this form?

THE DEFENDANT: Yes.

MR. CALLAWAY: Mr. Bailey, I show you this Guilty Plea Form and ask you if this is your signature?

THE DEFENDANT: Yes.

MR. CALLAWAY: Did you and I go over each and every paragraph of that form?

THE DEFENDANT: Yes.

MR. CALLAWAY: And did you answer the questions in your own handwriting?

THE DEFENDANT: Yes.

MR. CALLAWAY: Mr. Bailey, have you had any alcohol, drugs or medication in the last 24 hours?

THE DEFENDANT: No.

MR. CALLAWAY: Mr. Bailey, it is your desire to enter guilty pleas to these three charges. Therefore, there will not be a trial. Therefore, you give up all the rights you would have at a trial and your right to appeal.

THE DEFENDANT: Yes.

MR. CALLAWAY: And have I explained the Court could impose up to 50 years incarceration on these charges?

THE DEFENDANT: Yes.

MR. CALLAWAY: Have I explained to you under the robbery charge the Court is required under the law to impose a 2-year minimum sentence?

THE DEFENDANT: Yes.

MR. CALLAWAY: And have I explained to you under the Delaware Statute with respect to the weapons charge that any sentence you receive would be a mandatory sentence; that the Statute also requires that a 2-year sentence must be imposed?

THE DEFENDANT: Yes.

MR. CALLAWAY: Are you presently on probation or parole to any court? FC22 THE DEFENDANT: No.

MR. CALLAWAY: And have I explained to you the entry of a plea of guilty to this charge, which is a felony, would cause you to lose your right to be a juror, hold public office, and to own or possess a deadly weapon?

THE DEFENDANT: Yes; I understand.

Counsel thereafter handed the executed Plea Agreement and Guilty Form to the trial judge, who questioned petitioner as follows:

THE COURT: Mr. Bailey, do you think you have had adequate time to discuss this matter with Mr. Callaway?

THE DEFENDANT: Yes, sir.

THE COURT: Are you satisfied with the representation he has provided?

THE DEFENDANT: Yes, sir.

THE COURT: Are you entering these pleas of guilty to the charge of robbery in the first degree, possession of a deadly weapon during the commission of a felony, and assault first degree, because, in fact, you are guilty of these charges?

THE DEFENDANT: Yes.

THE COURT: All right. I will accept the pleas as they have been tendered.

(D.I. 4 at A6-A9)

According to Bailey, the trial judge himself is required personally to question the defendant and must expressly state, when the plea is accepted, that it is being entered knowingly and voluntarily. (D.I. 4 at 1-2) Bailey also argues that defense counsel's representations that his client understood the consequences of his plea and "conduct necessary to be guilty of charge does not relieve the Court of its responsibilities, to make sure Bailey 'possessed' an understanding of law in relation to the facts." (D.I. 4 at 2, citing *United States v. Vera*, 514 *6 F.2d 102, 104 (5th Cir.1975)). In support of his claim, Bailey directs the court to Delaware Criminal Rules 11(c) and (d), which state, in relevant part, that "the court must address the defendant personally ... and inform the defendant of, and determine that the defendant understands,"*inter alia:* (1) the nature of the charges, the mandatory minimum penalty, if any, and the maximum possible penalty; (2) that the defendant has the right to plead not guilty and to be tried by a jury; (3) that by pleading guilty, the defendant waives his right to a trial; and (4) that the court "shall not accept" a guilty plea "without first, by addressing the defendant personally in open court, determining that the plea is voluntary...."

In the present case, it is clear that this information was conveyed to Bailey at his plea colloquy. The nature of the charges were explained in the plea agreement, which Bailey indicated he had gone over with counsel; the trial judge repeated the charges in the colloquy, and asked Bailey if he was entering guilty pleas because he was in

http://web2.westlaw.com/print/printstream.aspx?utid=%7b...

fact guilty. Bailey answered in the affirmative. Defense counsel asked Bailey to state whether he had explained to him the maximum penalty for all counts and minimum penalties for two of the counts. Bailey answered "yes." Defense counsel further stated to Bailey that because he desired to enter guilty pleas, "there will not be a trial. Therefore, you give up all the rights you would have at a trial and your right to appeal." Bailey again responded "yes." Finally, the trial judge satisfied the requirement that voluntariness be ascertained by asking Bailey whether he had had adequate time to discuss his plea with counsel, and whether he was satisfied with counsel's representation. To each, Bailey answered in the affirmative.

The only question therefore is whether the identity of the conveyor rendered the colloquy constitutionally defective. The court finds that it did not. The purpose of the language in Rule 11(c) and (d) is "to establish clearly of record the voluntariness of the plea by a response directly from the defendant," rather than from defense counsel. *United States v. Davis,* 470 F.2d 1128, 1130 (3d Cir.1972). The Rule 11 requirement that the court "address the defendant personally" "does not necessarily mean that the words must literally issue from the judge's lips." *United States v. Hamilton,* 568 F.2d 1302, 1306 (9th Cir.1978) (interpreting parallel provision of Fed.R.Crim.P. 11) Instead, it means that the judge "must insure that the defendant understands the possible penalties before his plea is accepted." *Id.*

A formal violation of Rule 11 is cognizable on collateral attack only if it creates: (1) an error that is jurisdictional or constitutional; (2) a defect that results in a "miscarriage of justice;" (3) an omission inconsistent with the "rudimentary demands of fair procedure;" or (4) "extraordinary circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *United States v. Timmreck,* 441 U.S. 780, 783, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979).

*7 In reviewing the record against these standards, the court concludes that, even if Rule 11 was violated, the alleged Rule 11 violations cannot in themselves command relief on collateral attack. Bailey's attorney specifically stated during the plea proceedings that "the total range of sentencing available to the sentencing judge would be a 4 year minimum to a 50 year period of incarceration at Level 5." (D.I. 4 at A-5) Bailey's attorney also asked Bailey: "And have I explained the Court could impose up to 50 years incarceration on these charges?" (D.I. 4 at A-7) Bailey answered that question in the affirmative. (D.I. 4 at A-7) Based on this record, the court concludes that the trial judge had sufficiently insured that Bailey was aware of the possible penalties before he entered his plea of guilty. The court finds that any violation that may have resulted because the judge did not personally ask specific questions are not cognizable on collateral attack given the standard stated in *Timmreck. Id.*

IV. CONCLUSION

For the reasons stated above, the court finds that Bailey has failed to establish cause or that a miscarriage of justice would occur if his procedurally defaulted claims are not reviewed. The court also concludes that any defect in the plea colloquy is not cognizable on collateral attack. Therefore, the court shall deny Bailey's motion for writ of habeas corpus. An order consistent with this memorandum opinion shall issue.

D.Del.,1997.
Bailey v. Kearney
Not Reported in F.Supp., 1997 WL 309449 (D.Del.)

END OF DOCUMENT
© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

758 A.2d 933                                                                                          Page 1
758 A.2d 933, 2000 WL 1177628 (Del.Supr.)
**(Table, Text in WESTLAW), Unpublished Disposition**
**758 A.2d 933, (Del.Supr.)2000 WL 1177628**

Hill v. State
Del.Supr.,2000.
(The decision of the Court is referenced in the Atlantic Reporter in a 'Table of Decisions Without Published
Opinions.')

Supreme Court of Delaware.
Thomas J. HILL, Defendant Below, Appellant,
v.
STATE of Delaware, Plaintiff Below, Appellee.
No. 267, 2000.

Submitted June 23, 2000.
Decided Aug. 11, 2000.

Court Below-Superior Court of the State of Delaware, in and for New Castle County, Cr.A.Nos.
IN97-08-0952-R2, 0953-R2. Def. ID No. 9707009603.

Before VEASEY, Chief Justice, WALSH and BERGER, Justices.

*ORDER*

*1 This 11th day of August 2000, upon consideration of the appellant's opening brief and the State of Delaware's
motion to affirm pursuant to Supreme Court Rule 25(a), it appears to the Court that:

(1) The defendant-appellant, Thomas J. Hill, has appealed from the Superior Court's denial of Hill's second
motion for postconviction relief pursuant to Superior Court Criminal Rule 61 ("Rule 61"). The State of Delaware
has moved to affirm the judgment of the Superior Court on the face of Hill's opening brief that the appeal is
without merit.

(2) In March 1998, Hill entered into a plea agreement with the State pursuant to Superior Court Criminal Rule
11(e)(1)(c). The agreement provided that Hill would plead guilty to Assault in the First Degree (a lesser-included
offense of Attempted Murder in the First Degree) and Possession of a Firearm during the Commission of a
Felony. In return for Hill's plea, the State agreed to *nolle prosse* four other charges and to recommend that Hill
serve nine years at Level V followed by probation.

(3) On May 1, 1998, after a presentence investigation, the Superior Court sentenced Hill in accordance with the
plea agreement, i.e., to three years at Level V for the weapons offense. For Assault in the First Degree, the
Superior Court sentenced Hill, in accordance with the plea agreement, to 10 years at Level V, suspended after six
years, for four years at Level IV, suspended after 6 months, for three years and six months at Level III. Hill did
not appeal his sentence.

(4) On August 5, 1998, Hill filed a motion for reduction of sentence. Hill contended that the plea agreement provided that he should serve only three years in prison. By order dated August 26, 1998, the Superior Court denied Hill's motion. Hill did not appeal.

(5) On September 24, 1998, Hill filed a motion for correction of sentence pursuant to Superior Court Criminal Rule 35(a). Hill contended that the plea agreement provided that he was to serve only two and one-half years in prison. By order dated November 23, 1998, the Superior Court denied Hill's motion. Hill did not appeal.

(6) On January 26, 1999, Hill filed his first motion for postconviction relief. Hill alleged (i) ineffective assistance of counsel, (ii) unfulfilled plea agreement, and (iii) illegal sentence. Hill argued that his defense counsel did not advise him of the terms of his plea agreement, and that the Superior Court breached the agreement by sentencing Hill to a longer period of incarceration than the plea agreement had specified. By order dated April 9, 1999, the Superior Court summarily dismissed Hill's motion for postconviction relief on the basis that Hill understood the consequences of his guilty plea. Hill did not appeal.

(7) On May 3, 2000, Hill filed a motion for reduction or modification of sentence. By order dated May 9, 2000, the Superior Court denied Hill's motion as untimely and repetitive. Hill did not appeal.

(8) On April 17, 2000, Hill filed a second motion for postconviction relief. Hill again alleged (i) ineffective assistance of counsel, (ii) unfulfilled plea agreement, and (iii) illegal sentence. Hill alleged that his defense counsel changed the written plea agreement without Hill's knowledge,[FN1] and that the Superior Court did not explain the terms of the plea agreement and sentenced Hill to a longer period than the plea agreement had specified. By order dated May 11, 2000, the Superior Court denied Hill's motion, concluding that the motion was barred pursuant to Rule 61. This appeal followed.

> FN1. Hill contends that his counsel changed the number "6" to the number "9" on the plea agreement form under the "Sentence Recommendation/ Agreement" section. A hand-written change (initialed by both defense counsel and the prosecutor) appears on the form under the "Sentence Recommendation/ Agreement" section. It appears to the Court that the number "11" was changed to the number "9."

*2 (9) When reviewing the Superior Court's denial of a postconviction motion pursuant to Rule 61, this Court first must consider the procedural requirements of the rule before addressing any substantive issues.[FN2]Under Rule 61, any claim that was formerly adjudicated is thereafter barred, unless reconsideration of the claim is warranted in the interest of justice.[FN3] The Court is not required to consider a previously adjudicated claim "simply because the claim may have been refined or restated."[FN4]

> FN2.*See Stone v. State,* Del.Supr., 690 A.2d 924, 925 (1996).

> FN3.Super. Ct.Crim. R. 61(i)(4).

> FN4.*Riley v. State,* Del.Supr., 585 A.2d 719, 721 (1990).

(10) On appeal, as in his first and second postconviction motions, Hill alleges (i) ineffective assistance of counsel, (ii) unfulfilled plea agreement, and (iii) illegal sentence. The Court finds that the claims are procedurally barred under Rule 61(i)(4). The Superior Court considered Hill's claims in connection with his first motion for postconviction relief and found them to be without merit. Hill has presented no reason why reconsideration of the claims is warranted in the interest of justice.

(11) It is manifest on the face of Hill's opening brief that the appeal is without merit. The issues raised on appeal are clearly controlled by settled Delaware law, and to the extent the issues on appeal implicate the exercise of judicial discretion, there was no abuse of discretion.

NOW, THEREFORE, IT IS ORDERED that the State's motion to affirm is GRANTED. The judgment of the Superior Court is AFFIRMED.

Del.Supr.,2000.
Hill v. State
758 A.2d 933, 2000 WL 1177628 (Del.Supr.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                                                    Page 1
Not Reported in A.2d, 2005 WL 3560819 (Del.Fam.Ct.)
**2005 WL 3560819 (Del.Fam.Ct.)**

J.A.P. v. J.W.D.
Del.Fam.Ct.,2005.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Family Court of Delaware.
J A. P, Petitioner
v.
J W. D, Respondent
**No. CK05-01044, 05-00556.**

April 25, 2005.

Shawn Dougherty, for Petitioner.
Laura Browning, for Respondent.
WALLS, J.
**\*1** Assigned to the Court for judicial determination is a Request for Review of a Commissioner's Order filed on behalf of J D through his attorney, Laura Browning, Esquire, in response to an Order rendered by Commissioner Andrew Horsey, dated January 11, 2005. The matter before the Commissioner was a Petition for Protection From Abuse (hereinafter "PFA"). A hearing was held on January 11, 2005, at which J P (hereinafter "Aunt") appeared by and through her attorney Shawn Dougherty, Esquire, and J D (hereinafter "Nephew") appeared pro se.

Nephew objects to the Commissioner's Order on numerous grounds. The Court finds merit to the following two objections. First, Nephew objects to the Commissioner's Order on the basis that he was not a trespasser on Aunt's property. Second, Nephew contends that his behavior was not "abuse."

STANDARD OF REVIEW

A party may seek a review of a Commissioner's Order pursuant to title 10, section 915(d)(1) of the Delaware Code,[FN1] which provides:

FN1. DEL.CODE ANN. § 915(d)(1)(1999). *See also* FAM. CT. CIV. P.R. 53.1(e)(g).

Any party, except a party in default of appearance before a Commissioner, may appeal a final order of a Commissioner to a judge of the Court by filing and serving written objections to such order, as provided by the rules of Court, within 10 days from the date of the Commissioner's order. A judge of the Court shall make a de novo determination of those portions of the Commissioner's order to which objection is made. A judge of the Court may accept, reject, or modify in whole or in part the order of the Commissioner. The judge may also

receive further evidence or recommit the matter to the Commissioner with instruction.
*Id.*

Therefore, in the *de novo* determination, the Court will make an independent review of the record and decide whether to accept, reject, or modify in whole or in part the Commissioner's order.

DISCUSSION

In order to support the entry of a Protection From Abuse Order, the petitioner must demonstrate by a preponderance of the evidence that she has suffered "abuse," as defined by section 1041(1),[FN2] at the hands of the respondent. The term "abuse" is defined by the above section as any one of the following forms of conduct:

FN2.tit. 10, § 1041.

(a) Intentionally or recklessly causing or attempting to cause physical injury or sexual offense, as defined in § 761 of Title 11;

(b) Intentionally or recklessly placing or attempting to place another person in reasonable apprehension of physical injury or sexual offense to such person or another;

(c) Intentionally or recklessly damaging, destroying or taking the tangible property of another person;

(d) Engaging in a course of alarming or distressing conduct in a manner which is likely to cause fear or emotional distress or to provoke a violent or disorderly response;

(e) Trespassing on or in property of another person, or in property from which the trespasser has been excluded by court order;

(f) Child abuse, as defined in Chapter 9 of Title 16;

(g) Unlawful imprisonment, kidnapping, interference with custody or coercion, as defined in Title 11; or

*2 (h) Any other conduct which a reasonable person under the circumstances would find threatening or harmful.

*Id.*

The Commissioner stated that he found Nephew had abused his Aunt by being a trespasser on her property. Nephew objects to the Commissioner's Order on grounds that he was not a trespasser on Aunt's property under section 1041(1)(e), and therefore a Protection From Abuse Order should not have been awarded on those grounds. Nephew argues that the parties had an oral agreement that he would take care of Aunt's property in exchange for housing and a portion of the land that was to be deeded to him. Nephew contends that Aunt used the PFA process to remove him from the house without going through other courts that have jurisdiction over property and contract claims.

The Court understands that Aunt lives on a 23 acre farm. Aunt owns two mobile homes and one house on the property. It is undisputed that Nephew moved from Baltimore to Delaware and took up occupancy in the

house on Aunt's property. Nephew has been living on her property for a little over two years. Nephew testified that the reason he moved to Delaware was because of Aunt's offer to give him one acre of land to build a house on for his family.

Nephew also testified that he moved to Delaware to help Aunt. Aunt was living in a mobile home on the property when Nephew first moved to Delaware. After Nephew moved to Delaware, Aunt was hospitalized with a leg infection. After Aunt was discharged she moved into the home with Nephew. It is undisputed that after Aunt moved in with Nephew, their relationship was strained and the parties argued. It is also undisputed that Aunt requested that Nephew leave her property. According to testimony at trial, Aunt still refuses to sign the legal papers granting Nephew his right to a portion of the property.

The Court finds that the dispute brought before the Commissioner centered on property rights and contract law rather than protection from abuse. The Court finds that Family Court is without jurisdiction to determine what, if any, rights Nephew has in Aunt's property. Likewise, Family Court is without jurisdiction to determine the existence of and the terms of an oral contract between the parties.

Family Court's jurisdiction is limited by statute. Under the Protection from Abuse Statute, the Commissioner had authority to enter a PFA against Nephew if Nephew was trespassing on Aunt's property. By Aunt's own testimony, Nephew has been living in the house on her property for two years. While the Court refrains from making a determination as to the enforceability of an oral contract between the parties, the Court has enough information to determine that there was some type of arrangement between the parties whereby the Nephew moved to Delaware to help Aunt and Aunt allowed Nephew to live on her property. The Court finds that alone is enough information to find that there was no unlawful trespass on Aunt's property. Therefore, absent any other finding of abuse by the Commissioner, a Protection from Abuse Order should not have been granted.

**\*3** Second, the Commissioner found that Nephew had abused Aunt by arguing with her. Nephew objects to the Commissioner's Order on the basis that Aunt is mentally unstable and a reasonable person would not have considered his behavior "abuse."

Aunt testified regarding Nephew's behavior that she considered "abuse." First, Aunt testified that Nephew scares her when he threatens to kill her cats. Aunt testified that Nephew has never physically threatened her, but has indirectly threatened her because Nephew knows that she will get in front of the shotgun and not let him hurt her cats. Second, Aunt testified that Nephew turns the heat down in the residence. Third, Aunt testified that Nephew wakes her up very early in the morning. Fourth, Aunt testified that Nephew threw a chair into the table.

Nephew addressed the majority of these accusations when he testified. The Court understands that Aunt's cats have become a main source of contention between the parties. According to Nephew's testimony, Aunt has 50-60 cats. Because of the filth from the cats in her mobile home, it became uninhabitable. Nephew testified that he has encouraged Aunt to properly care for the cats, but she refuses to clean up after the cats, get them spayed or neutered, or have them properly vaccinated. Nephew testified that some of the cats have rabies and his son has gotten bitten by one. However, Nephew denied any threats to kill the cats.

Nephew acknowledged that he does keep the thermostat at 62 degrees because when Aunt turns up the heat to 80 degrees, Nephew's asthmatic son cannot breathe. He testified that a thermometer in the home indicates that the temperature is consistently at 70 degrees. He testified that Aunt refuses to sleep in the bedroom they set up for her in the house. Instead she sleeps on the couch in the living room. Nephew testified that when he gets home early in the morning he wakes her up. He stated, "there is no way not to wake her up when I come into

the house."Nephew stated in his closing that he had forgotten to address the chair incident and was not allowed to respond to the accusation in his closing.

In awarding the Protection From Abuse Order, the Commissioner did not make a determination as to the credibility of any of the specific accusations of abuse against Aunt. Instead, the Commissioner simply stated that Nephew abused her by arguing with her. The Court finds that under the circumstances arguing with Aunt does not rise to the level of abuse as defined within the statute.

The Court finds that in this case the PFA proceeding was primarily used as a way to circumvent proper procedures in other courts to determine property rights between the parties. After an independent review of the record below, the Court REJECTS IN WHOLE the Commissioner's January 11, 2005 Order. The Commissioner's Order, dated January 11, 2005 is hereby VACATED. Without more, the parties are left to settle their disputes and assert their respective property rights in the proper forum.

**\*4 IT IS SO ORDERED.**

Del.Fam.Ct.,2005.
J.A.P. v. J.W.D.
Not Reported in A.2d, 2005 WL 3560819 (Del.Fam.Ct.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                                          Page 1
Not Reported in A.2d, 1996 WL 797034 (Del.Fam.Ct.)
**1996 WL 797034 (Del.Fam.Ct.)**

Thomas v. Thomas
Del.Fam.Ct.,1996.
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Family Court of Delaware, New Castle County.
Robert L. THOMAS, Petitioner,
v.
Carol L. THOMAS, Respondent.
**No. CN95-09052, 95-36629.**

Submitted July 17, 1996.
Decided Oct. 7, 1996.

Request for Review of a Commissioner's Order.
Commissioner's Order Reversed.

Robert L. Thomas, Represented by Alfred J. Lindh.
Carol L. Thomas, pro se.BUCKWORTH, Judge.

I. *Introduction*

**\*1** This is the Court's decision on the Request for Review of a Commissioner's Order filed by Robert L. Thomas ("Petitioner") against Carol L. Thomas ("Respondent"). The standard of review for an appeal from a Commissioner's final order is a "de novo determination of the matter, based on the record below."10 *Del. C.* § 915(d)(1), Del. Fam. Ct. Civ. R. 53.1(e). Petitioner asserts in his Request for Review that the Commissioner erred in denying his Motion for Relief from an Order of Protection from Abuse (hereinafter "Motion for Relief").

II. *Relevant Factual and Procedural History*

A consensual Order of Protection from Abuse (hereinafter "PFA Consent Order") was issued by the Court on December 22, 1995. On June 24, 1996, Petitioner filed a Motion for Relief from the PFA Consent Order on the ground that Respondent, having been awarded exclusive possession and control of the former marital residence by the PFA Order, had since abandoned the property and it was consequently falling into disrepair. This motion was presented to the Commissioner by Petitioner's counsel on July 16, 1996. The Commissioner held a hearing on the matter, wherein Respondent testified that she had indeed abandoned the former marital residence. Although the Commissioner expressed sympathy for the Petitioner's position, she nevertheless denied Petitioner's Motion for Relief, holding that because the original PFA Order was entered with the consent of both parties, both parties also needed to consent to any subsequent modification of the Order. Having found that the

Respondent refused to consent to modification, the Commissioner concluded that her hands were tied. She suggested that Petitioner seek relief either by filing a Rule to Show Cause against Respondent or opening up new PFA proceedings.


III. *Discussion*

The Court disagrees with the Commissioner's conclusion that modification of a PFA consent order can occur only by mutual consent. The Court holds that under appropriate circumstances a consensual PFA order can be modified absent the consent of both parties.


A. *The Plain Meaning of the Statute*

The statute controlling the issuance and modification of PFA orders unambiguously provides the Court with the power to modify an existing PFA order -- consensual or otherwise -- as long as the proper procedures are followed. The sections pertaining to modification of PFA orders are found in 10 *Del. C.* § 1045 (b)-(d) (emphasis added), which provide that:

(b) Relief granted under this section shall be effective for a fixed period of time, not to exceed 1 year, except that such order may be extended or modified by a further order of the Court as described in subsections (c) and (d) of this section.

(c) An order issued under this part may be extended, for up to 6 months, or terms of the order modified, upon motion by either party. Hearings on such motions shall be scheduled within 30 days after proof of service on the respondent is filed. Such motions may be heard on an emergency basis if filed in accordance with § 1043 of this title.[FN2]

   FN2. § 1043 is titled "Ex parte orders and emergency hearings."

**\*2** (d) Only the Court shall modify an order issued under this part and the reconciliation of the parties shall have no effect on the validity of any of the provisions of such an order. The protective order may be modified or rescinded during the term of the order upon motion, after notice to all parties affected and a hearing.
The statute provides a mechanism for the modification of PFA orders without distinguishing between PFA orders that are entered by consent and those that are entered after a full hearing and an official finding of abuse. "Absent ambiguity or doubtful meaning, there is no occasion for resort to constructional aids." *Brown v. Robyn Realty Co.,* Del. Supr., 367 A.2d 183, 189 (1976). Thus, the intent of the legislature can and should be taken from the unambiguous language of the statute.

A "clear meaning" analysis of the statute indicates an intent to enable the Court to modify a PFA order -- consensual or otherwise -- upon motion of either party, as long as the proper procedure is followed. The key factor in considering the appropriateness of a non-consensual modification of an existing PFA consent order is not whether the parties agree to the modified terms, but rather whether the parties potentially affected by the modification have had the opportunity to present their cases in a properly noticed hearing. As long as the court holds a hearing on the proposed modification and the affected parties receive notice of that hearing, the court has the power to change the terms of the PFA order even if it was originally entered by consent.

This statutory interpretation is consistent with the Court's recent opinion in the *Deyarmin* case where the Court held that it did not have the authority to modify a PFA consent order without the prior consent of both parties, unless there was some type of finding against the Respondent. *Deyarmin v. Deyarmin*, Del. Fam., File No. CN96-6592, Buckworth, J. (July 23, 1996). In *Deyarmin* the movant for the PFA order modification was the party that had allegedly been abused. There the Court was primarily concerned with protecting the Constitutional rights of the non-moving party -- i.e., the alleged abuser, Respondent. The Court recognized that a non-consensual modification could occur, but only if a full hearing were held and a finding was made on the record either of abuse or of a contemptuous violation of the existing PFA order. Without either a hearing and a finding or the consent of both parties, the Court concluded that it would be violative of the Respondent's rights to make a modification.

In cases like the one *sub judice*, however, where it is the party subject to the PFA order -- i.e., the alleged abuser -- that is moving for the modification, his Constitutional rights are not in jeopardy. Nonetheless, the Court must ensure that the procedural path laid out in 10 *Del. C.* § 1045 is rigorously followed. This means that all parties potentially affected by the modification -- notably the alleged victim of abuse -- must be put on notice, and the court must hold a hearing before making any modifications to the PFA order. Where the party moving to modify the PFA order is the alleged abuser, as in this case, the Court must hold a hearing and find that circumstances have changed significantly since the original PFA order was issued in order to justify any modification. This is in contrast to cases like *Deyarmin* where the alleged victim is the party moving to modify and the court must make a finding of abuse or contempt. Thus in the instant case, since Petitioner was the alleged abuser, the Commissioner had the power to modify the PFA order without the consent of the Respondent as long as there was both a properly noticed hearing and a finding of changed circumstances significant enough to warrant relief.

## B. *The Contract Theory*

**\*3** Although the contract theory of consensual PFA orders was not brought up either during the hearing of July 16 or in the Commissioner's subsequent denial of Petitioner's Motion for Relief, it seems to underlie the Commissioner's order. In any case the Court feels it is appropriate to address the issue here to avoid future confusion on the matter.

Advocates of the "contract theory" of consensual PFA orders believe that a PFA order that is entered into by mutual consent constitutes a contract between the parties that should not be rewritten or modified by a court except by mutual consent. Under this theory, a consensual PFA order is likened to a separation agreement reached privately between two parties pursuant to a divorce.

In divorce situations, the means by which alimony is determined affects the future modifiability of any payments. In cases where alimony payments are judicially determined by the Family Court pursuant to its powers ancillary to divorce proceedings and absent private agreements by the parties, the legislature has given the courts the power to modify those awards using the statutory standard of "real and substantial change." *Rockwell v. Rockwell*, Del. Supr., File No. CN93-1108 (July 31, 1996), *citing* 13 *Del. C.* § 1519(a)(4).

However, the Delaware Supreme Court has held that "when the Family Court is asked to modify or terminate an alimony award that is set forth in a court order, pursuant to an agreement of the parties, the proper standards are the same that are generally applicable to the modification, reformation, or rescission of contracts." *Rockwell v. Rockwell*, Del. Supr., File No. CN93-1108 (July 31, 1996)(emphasis added).*See also, Gertrude L.Q. v. Stephen P.Q.*, Del. Supr., 466 A.2d 1213, 1217 (1983). In fact, the Court explicitly stated that "a stipulated alimony agreement of

the parties, pursuant to Section 1519(b), is not a court order within the meaning of Sections 1518 and 1519(a) (4)."*Id.* The result of this holding has been to prevent the Family Court from employing the statutory "real and substantial change" standard to modify separation agreements in cases where the parties have entered into a private agreement. Instead, if the Court wishes to alter the terms of a private agreement, it must first find a reason why the contract should be rescinded or considered invalid.

If consensual PFA orders were also found to be contractual in nature, the Family Court would be similarly limited in its ability to modify them without either the consent of the parties or some reason to invalidate the contract. PFA consent orders, however, are so distinguishable from private separation agreements that they should be viewed as court-modifiable orders rather than as unmodifiable contracts.

The most telling distinctions between private separation agreements and PFA consent orders involve the means by which they are issued and become enforceable. Unlike a PFA consent order, a separation agreement can be reached without any court involvement whatsoever. Separating parties can negotiate and enter into a private agreement that will be binding upon them regardless of whether the agreement is ever incorporated into a Family Court Judge's order. The parties to the agreement do not ever have to participate in court ordered mediation; they do not have to be represented by counsel; and their agreement does not even have to meet with judicial approval. In short, because a separation agreement is entered into privately, it is a contract and not a court order. Because it is not a court order, it cannot be modified by the court. Thus, as long as the agreement is in conformity with contract law it will be upheld.

**\*4** A PFA consent decree, in contrast, is unmistakably a court order. It cannot be entered into privately. In fact, it cannot come into being without judicial supervision at virtually every phase of the process. First, one party petitions the court for a PFA order. Then the parties must appear before a hearing officer who attempts to facilitate a settlement agreement between the parties. If that effort fails, a hearing is held before a Commissioner or Judge to determine whether there has been abuse. However, even if negotiations are successful and an agreement is reached, both parties must still appear before a Master, Commissioner, or Judge who is required to go through a lengthy colloquy to ensure that the agreement has been entered into voluntarily and that the parties are aware of the rights they are giving up.

Notably, even where the parties have come to an agreement, it is the Master, Commissioner, or Judge who makes the final determination as to whether the PFA order should be issued. It is entirely within the Court's power to reject a consent agreement that it feels is imbalanced or does not adequately protect the interests of one of the parties or a child. Thus, while agreement between the parties is a crucial element of a PFA consent order, such a decree is nonetheless a court order that can never even come into existence -- let alone be enforced -- without the oversight, participation, and sanctioning of the Family Court. This court involvement is what distinguishes PFA consent orders from private separation agreements. It is also what removes PFA consent orders from the realm of contracts and makes them modifiable by the Family Court pursuant to 10 *Del. C.* § 1045 (b)-(d).

## IV. *Decision*

Having reviewed the record established by the Commissioner concerning Petitioner's Motion for Relief, the Court hereby reverses the Commissioner's order denying Relief and modifies the PFA Consent Order accordingly. The Court is satisfied that the Commissioner held a properly noticed hearing where both parties potentially affected by any modification of the PFA Consent Order were given an opportunity to present their positions. The Court is further satisfied that the testimony at that hearing established that Respondent has

abandoned the marital residence and allowed it to suffer waste. Furthermore, the Court concludes from Respondent's voluntary departure that she no longer requires the type of protection that was intended by the award of exclusive use and possession of the marital residence to her. Accordingly, the Court finds that Respondent's abandonment constitutes a change in circumstances significant enough to warrant a modification of the PFA Consent Order.

Having made these determinations, the Court concludes that principles of equity warrant an immediate grant of Petitioner's requested relief, thereby avoiding further wasteful delay that would be caused by a remand to the Commissioner. Therefore, the clause in the PFA Consent Order concerning the use and possession of the residence is now modified to give Petitioner, Robert L. Thomas, exclusive use and possession of the home and requiring Respondent, Carol L. Thomas, to make arrangements with Petitioner to return to the residence accompanied by a police escort if she needs to retrieve personal items or effects from therein. This opinion affects only that aspect of the PFA Consent Order concerning the use and possession of the residence. Petitioner must continue to abide by all other requirements of the PFA Consent Order.

**5 IT IS SO ORDERED.

Del.Fam.Ct.,1996.
Thomas v. Thomas
Not Reported in A.2d, 1996 WL 797034 (Del.Fam.Ct.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

788 A.2d 529                                                                                      Page 1

788 A.2d 529, 2001 WL 1586877 (Del.Supr.)

**(Table, Text in WESTLAW), Unpublished Disposition**

**788 A.2d 529, (Del.Supr.)2001 WL 1586877**

Webb v. State

Del.Supr.,2001.

(The decision of the Court is referenced in the Atlantic Reporter in a 'Table of Decisions Without Published Opinions.')

Supreme Court of Delaware.

William J. WEBB, Jr., Defendant Below-Appellant,

v.

STATE of Delaware, Plaintiff Below-Appellee.

**No. 589, 2000.**

Submitted Oct. 26, 2001.

Decided Dec. 7, 2001.

Reargument Denied Jan. 30, 2002.

Court Below-Superior Court of the State of Delaware, in and for New Castle County, Cr.A. Nos. 99-08-0767 99-08-0768 99-08-2482 VN97-03-0286-01.

Before VEASEY, Chief Justice, WALSH and HOLLAND, Justices.

ORDER

**\*1** This 7th day of December 2001, upon consideration of the briefs on appeal and the record below, it appears to the Court that:

(1) The defendant-appellant, William J. Webb, filed this appeal from the November 27, 2000 order of the Superior Court denying his second motion for postconviction relief pursuant to Superior Court Criminal Rule 61. We find no merit to the appeal. Accordingly, we AFFIRM. Because of an error in Webb's sentence for burglary, however, we REMAND to the Superior Court for the limited purpose of correcting Webb's sentencing order.

(2) In this appeal, Webb claims that the Superior Court abused its discretion by dismissing his second motion for postconviction relief as procedurally barred. Specifically, Webb claims that, because the Superior Court incorrectly stated that he had not asserted a claim of coercion in his first motion for postconviction relief and because the prosecutor's breach of the plea agreement violated his constitutional rights, the procedural bars should not apply.[FN1] Webb also claims that the Superior Court abused its discretion by denying his motion for transcripts of the plea colloquy and sentencing hearings.

       FN1.Super. Ct.Crim. R. 61(i)(2), (4) and (5).

(3) In March 2000, Webb pleaded guilty to Burglary in the First Degree, Assault in the First Degree and Endangering the Welfare of a Child. He also admitted to violating the terms of a previously imposed period of probation. On the burglary conviction, Webb was sentenced to 12 years incarceration at Level V, to be suspended after 5 years for decreasing levels of probation.[FN2] On the assault conviction, he was sentenced to 30 months incarceration at Level V, to be suspended after 24 months for decreasing levels of probation. On the endangering conviction, he was sentenced to 12 months incarceration at Level V, to be suspended for probation. On the violation of probation, Webb was sentenced to 3 years incarceration at Level V. Webb did not file a direct appeal of his convictions or sentences. He did, however, file two postconviction motions, the second of which he now appeals to this Court.

    FN2. Laudably, the State points out that Webb should not have been sentenced to more than 10 years incarceration at Level V on the burglary conviction. 11 Del. C. §§ 826, 4205(b)(3).

(4) When reviewing a motion under Rule 61, a court must first determine that the motion satisfies the procedural requirements of the rule before addressing any substantive issues.[FN3] Contrary to Webb's allegation, the Superior Court did not dismiss his motion on the ground that he had failed to assert a claim of coercion in his previous motion. Rather, the Superior Court correctly held that, to the extent Webb had asserted claims in his previous motion for postconviction relief that were re-asserted in his present motion and to the extent Webb asserted claims in his present motion that had not been asserted previously, all such claims were procedurally barred.[FN4]

    FN3. *Bailey v. State*, Del.Supr., 588 A.2d 1121, 1127 (1991).

    FN4. Super. Ct.Crim. R. 61(i)(2) and (4).

(5) Webb next claims that the prosecutor breached the plea agreement by recommending 28, rather than 20, years of Level V imprisonment at the sentencing hearing.[FN5] Webb alleges that this breach constituted a violation of his constitutional rights and rendered the procedural bars inapplicable. Webb is incorrect that the prosecutor's alleged breach of the plea agreement excuses his procedural default.[FN6] Even if the prosecutor did recommend a sentence in excess of what was agreed to, there was no prejudice to Webb since the total amount of the Level V sentence imposed by the Superior Court was less than 20 years.

    FN5. The plea agreement contains the following language: "State agrees not to recommend more than 20 years L[evel] V."

    FN6. Super. Ct.Crim. R. 61(i)(2), (4) and (5).

*2 (6) Webb's final claim that the Superior Court abused its discretion by denying his request for transcripts is also unavailing. It was within the discretion of the Superior Court to determine whether transcripts were needed in order to rule on Webb's motion for postconviction relief.[FN7] There was no error or abuse of discretion on the part of the Superior Court in determining that it was able to rule on the motion without the transcripts.

    FN7. Super. Ct.Crim. R. 61(d)(3).

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED. This matter is REMANDED to the Superior Court for correction of Webb's sentence for Burglary in the First Degree from 12 years incarceration at Level V to 10 years incarceration at Level V. Jurisdiction is not retained.

## CERTIFICATE OF SERVICE

The undersigned, being a member of the Bar of the United States District

Court for the District of Delaware, hereby certifies that on August 4, 2008,

1. He electronically filed the attached document (Answer) with the Clerk

of the District Court using CM/ECF.

2. He caused two copies of the attached document to be placed in the

United States Mail, first class postage prepaid, addressed to the following non-

registered participant:

John H. Benge, Jr.
No. 494395
Sussex Correctional Institution
P.O. Box 500
Georgetown, DE 19947


Loren C. Meyers
Deputy Attorney General
Department of Justice
820 N. French Street
Wilmington, DE 19801 ·
(302) 577-8844
Del. Bar ID 2210
loren.meyers@state.de.us